IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JOHNNY LINSON,                          )
    Plaintiff,                     )
                                        )
v.                                      )    No. 3:06-CV-39
                                        )    (Phillips)
LOCKHEED MARTIN ENERGY SYSTEMS, INC.,   )
and BWXT Y-12, L.L.C.,                  )
    Defendants.                    )

## MEMORANDUM OPINION

Plaintiff Johnny Linson has sued his former employers, Lockheed Martin Energy Systems, Inc. and BWXT Y-12, L.L.C. (BWXT), alleging systemic racial discrimination in employment through discriminatory selection, promotion, compensation, and disciplinary policies, practices and procedures, discriminatory terms and conditions of employment, and the existence and perpetuation of a racially hostile work environment in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendant BWXT has moved for summary judgment asserting that there are no genuine issues as to material facts, and that BWXT is entitled to judgment as a matter of law on all of plaintiff's claims. For the reasons which follow, defendant's motion for summary judgment will be granted, and this action will be dismissed against BWXT.

## Factual Background

Beginning April 1, 1984, pursuant to a contract with the Department of Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000. Linson was employed by LMES and the predecessor government contractors at Y-12 from April 14, 1969 until October 31, 2000. Linson was employed by BWXT from November 1, 2000 until February 28, 2001, at which time he retired by going on long term disability related to chronic depression, heart problems, and chronic beryllium disease. Linson served in the Utilities Department throughout his tenure at Y-12.

During Linson's employment at Y-12, he was a member of the Operating Engineers Union, Local 900. The terms and conditions of his employment were governed by contracts between the respective government contractors and the Atomic Trades and Labor Council (ATLC). The contracts between the government contractors and the ATLC governed the utility operators' rate of pay and included a provision prohibiting racial discrimination.

Linson's general supervisor was David Harvey. Harvey reported to Charles Krull, the manager of the Utilities Department.

In the mid-1990s, the Utilities Department adopted new safety procedures as part of its "Conduct of Operations." The new Conduct of Operations required utility operators to record the temperatures of various equipment within one hour of the time specified on a log called a "round sheet." If an unforeseen circumstance arose, operators could take readings outside of the one-hour period as long as they explained why in the narrative section of the round sheet. This procedure was designed to help operators detect abnormal conditions that could damage equipment or create an unsafe work environment.

In October 2000, Wayne Hensley, Shift Operations Advisor in the Utilities Department, discovered that Linson had incorrectly recorded readings on a number of different round sheets. Hensley reported the incorrect readings to Janet Sexton, Human Resources representative. Hensley reported that Linson had taken several readings over an hour-and-a-half early and others over one hour late, and he had failed to explain the untimely entries in the narrative section of the round sheets.

Sexton immediately began an investigation. On October 25, 2000, she met with Linson, a union steward, Linson's supervisor and another Human Resources representative. At the meeting, Linson admitted that he had made mistakes on the round sheets, but stated that he had forgotten the "new" procedure.[1] Sexton emphasized the

---

[1] The round sheet procedure had been in effect since approximately 1996, and Linson had received training on how to complete round sheets.

importance of recording the readings on the round sheets within the proper time frame, and Linson acknowledged that he understood the procedure.

Following the meeting with Linson, Sexton reviewed the company's discipline records and discovered that two white employees had been disciplined for round sheet violations. The first incident occurred in March 1998. A chemical operator named Roy Boone was given decision-making leave because he had recorded false data on a round sheet. The second incident occurred in May 1998. A utility operator named Don Hastings had recorded that a machine was operational on a round sheet, but it was later discovered that the machine had been shut down before the readings were taken. During an investigation conducted by Human Resources, Hastings admitted that he did not take the readings; rather, he copied previously recorded readings on the round sheet because he was in a hurry. At the time of the investigation, Hastings was on probation for failing to wear proper protective equipment. He retired in lieu of discharge.

Sexton discussed the findings of her investigation with her superior, Olga Henley. They determined that Linson had recorded readings outside of the prescribed time period on several different occasions. Sexton and Henley decided that an oral reminder would be sufficient discipline because Linson had received no prior reprimands. Charles Krull and David Harvey agreed, and Linson received an oral reminder on November 21, 2000.[2]

---

[2] An oral reminder is a lesser form of discipline than decision-making leave.

Less than three months later, Wayne Hensley reported that Linson had falsified a reading on a round sheet. Hensley stated that the temperature Linson recorded on a round sheet was impossible given the time the reading was taken. Linson had recorded that the machine's temperature was 410° at 8:50 a.m. Hensley checked the machine after Linson at about 8:55 a.m., and the temperature was 380°. Hensley determined that the reading Linson entered could not have been correct because a machine's temperature rises the longer it operates. Hensley concluded that Linson never actually took a reading and entered a false reading on the round sheet.

Hensley again contacted Janet Sexton, who began a second investigation. Sexton met with Linson, his direct supervisor, David Harvey, and Jim Barnes, BWXT's Diversity Manager. When Sexton questioned Linson about his entry, Linson admitted that he had taken the reading outside the required time period (between 7:30 and 7:45). He also acknowledged that he should have explained the reason for taking the reading over an hour early in the narrative section of the round sheet. Linson did not explain the discrepancy regarding the machine's temperature.

Because the evidence indicated that Linson had falsified the round sheet, he could have been placed on decision-making leave or discharged. However, Linson stated that he had not intentionally falsified the round sheet and BWXT gave him the benefit of the doubt. He was given a written reprimand for taking a reading over an hour early while the oral reminder for the same infraction was still in effect. Neither the oral reminder nor the

written reprimand that Linson received affected his compensation or any other term or condition of his employment.

On December 10, 1996, Linson filed a charge with the EEOC against Lockheed Martin Energy Systems and the Atomic Trades and Labor Council. On November 6, 1998, Linson filed a lawsuit against LMES and the ATLC in Federal Court. He filed a second charge of discrimination against Lockheed Martin on December 28, 1998. Because Linson had filed suit in Federal Court, on December 21, 1998, the EEOC dismissed Linson's second charge. On July 22, 1999, Judge James H. Jarvis, entered an order dismissing Linson's case without prejudice for failure to prosecute. Linson did not revive the dismissal of his lawsuit. Linson did not amend his second EEOC charge to include BWXT and he has never filed a charge of discrimination against BWXT.

BWXT has moved for summary judgment asserting that Linson was not subjected to any sort of racial harassment during his employment by BWXT; thus, he has no hostile work environment claim against BWXT, and BWXT is entitled to judgment as a matter of law on plaintiff's claim.

Plaintiff Johnny Linson has responded in opposition, stating that the evidence in this case demonstrates that he was subjected to a hostile work environment, discriminatory terms and conditions of employment, thus precluding summary judgment in favor of BWXT.

## Standard of Review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## Analysis

Linson's Title VII claims against BWXT are barred because he did not file an EEOC charge against BWXT. Linson argues that his Title VII claims against BWXT are viable because BWXT had notice of the charges he filed against Lockheed Martin. Lockheed Martin and BWXT are wholly separate legal entities. Linson never filed a charge against BWXT for discriminatory conduct. It is undisputed that the EEOC never

-7-

Case 3:06-cv-00039   Document 40   Filed 06/29/06   Page 7 of 13   PageID #: 41

investigated any allegations against BWXT. A plaintiff must file a timely charge of discrimination with the EEOC before filing a complaint in federal court. *See* 42 U.S.C. § 2000e-5(e); *Davis v. Sodexho,* 157 F.3d 460, 463 (6th Cir. 1998). Accordingly, Linson's Title VII claim against BWXT will be dismissed for failure to exhaust his administrative remedies. *See Ward v. Hickory Steak House,* 2003 WL 21920027 (6th Cir. 2003) (affirming summary judgment and dismissing employer in Title VII case where the employer was not named in the EEOC charge and the EEOC never investigated any claims against it).

The only allegations that relate to BWXT in this action are the oral reminder on November 21, 2000 and the written reprimand on February 22, 2001. Linson's remaining allegations pertain to the period when Lockheed Martin was his employer.[3] Summary judgment will be granted to BWXT because Linson cannot establish a *prima facie* case of discrimination with regard to the oral reminder or the written reprimand, nor can he show that BWXT's reasons for its disciplinary decisions were prextextual.

The order, allocation, and standard of proof in Title VII and § 1981 cases is governed by the three-part analysis set forth in *McDonnell Douglas Corp. V. Green,* 411

---

[3] Linson also alleges other hostile environment claims against BWXT, such as failure to give overtime work, assignments to beryllium areas, assignments under Davidson, and the continual sabotage of his machines by co-workers. The court has previously found these claims to be without merit as to Lockheed Martin. Moreover, Linson has provided no specific facts showing that any of these alleged actions took place after BWXT assumed the Y-12 contract from Lockheed Martin on November 1, 2000. However, to the extent that Linson can show that any of the alleged conduct occurred during his employment with BWXT, for the reasons stated in the court's memorandum opinion granting summary judgment to Lockheed Martin, BWXT is also entitled to summary judgment on Linson's claims regarding overtime work, assignments to beryllium areas, assignment under Davidson, and sabotage of his machines by co-workers

U.S. 792 (1973); *Texas Dept. Of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981); and *St. Mary's Honor Ctr v. Hicks,* 509 U.S. 502 (1993). *See also, Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (the same substantive analysis applies to Tile VII and § 1981 claims). Under this analytical framework, the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Burdine,* 450 U.S. at 252-53. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the contested action. *Id.* Once the defendant satisfies this burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is really a pretext for discrimination. *Id.* at 254-55. The plaintiff at all times bears the ultimate burden of persuasion that the employer's conduct was the product of intentional race discrimination. *Hicks,* 509 U.S. at 510-12.

To make out a *prima facie* case of disparate treatment, Linson must establish that (1) he was subjected to an adverse employment action, and (2) similarly situated white employees were treated better. *See Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir. 2004). BWXT asserts that Linson cannot establish a *prima facie* case because his oral reminder and written reprimand do not constitute adverse employment actions.

An "adverse employment action" is a "materially adverse change in the terms or conditions of employment." *Policastro v. Northwest Airlines*, 297 F.3d 535, 539 (6th Cir. 2002). A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material

-9-

loss of benefits, or other indices that might be unique to a particular situation. *Ford v. GMC,* 305 F.3d 545, 553 (6th Cir. 2002). A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Kocsis v. Multi-Care Mgmt, Inc.,* 97 F.3d 876, 886 (6th Cir. 1996). *De minimis* employment actions are not materially adverse and, thus, not actionable. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461 (6th Cir. 2000).

Linson has failed to raise a genuine issue of material fact regarding whether he was subjected to an adverse employment action affecting the terms and conditions of his employment with BWXT. The record shows that the alleged adverse actions taken against Linson were an oral reminder and a written reprimand. Linson was not demoted, he was not denied a promotion, he did not lose any wages or benefits, and the duties of his position were not materially changed in a manner that impacted the conditions of his employment. Thus, Linson's oral reminder and written reprimand do not constitute adverse employment actions as a matter of law.[4]

Linson's claim also fails because he cannot show that a similarly situated white employee was treated more favorably. Roy Boone and Don Hastings committed similar infractions, but were given more severe discipline than Linson. Linson states that

---

[4] The court's analysis is the same under the recent Supreme Court holding in *Burlington Northern & Santa Fe Railway Co. v. White,* 2006 WL 1698953 (S.Ct. June 22, 2006) which extended the scope of the anti-retaliation provision of Title VII beyond ultimate employment decisions to provide broader protection for victims of retaliation. Linson has not asserted a claim for retaliation against LMES.

white utility operators received lesser discipline for making mistakes on round sheets. For example, John McGaha failed to put a red circle around readings that were out of range and forgot to take readings on one occasion. McGaha was given verbal coaching and counseling. But unlike Linson, McGaha did not record <u>incorrect</u> information on a round sheet and never took readings outside the one-hour grace period without explaining why in the narrative section.

Although Linson points to two white utility operators who were not disciplined when they took round sheet readings early, those operators were not similarly situated to Linson. The incidents on which Linson relies occurred in 1998, when the Conduct of Operations was still being implemented and all employees, including Linson, were given time to learn the new round sheet procedures before discipline was issued. Moreover, the white employees referred to took readings five minutes early on one occasion, while Linson admitted taking readings more than an hour late or an hour early on several occasions. Because Linson cannot show that his round sheet violations were similar to those of other white utility operators, he has failed to show that he was treated differently or less favorably than the white utility operators.

BWXT has articulated a legitimate, nondiscriminatory reason for Linson's discipline – two internal investigations revealed that Linson had violated the Conduct of Operations in November 2000, and again in February 2001. These documented reasons satisfy BWXT's burden to produce nondiscriminatory reasons for the employment actions.

Once the employer makes such a showing, the burden then shifts back to Linson to show that BWXT's reasons are pretextual. To do so, Linson is required to show either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decisions; or (3) that they were insufficient to motivate BWXT's decision. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

Linson argues that Sexton's investigation was flawed, but the record reflects that Sexton conducted a prompt, thorough investigation and BWXT had a reasonable basis for believing that Linson had committed the infractions for which he was disciplined. Sixth Circuit precedent does not "require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). An investigation is sufficient if the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* Based on the evidence submitted by the parties, the court concludes that LMES reasonably relied on particularized facts in making a reasonably informed and considered decision to discipline Linson. Linson has not presented sufficient evidence such that a factfinder could find that BWXT's given reasons for his discipline were pretextual, nor has he met the ultimate burden in this case of presenting sufficient facts to show that he was the victim of intentional race-based discrimination. There are no genuine issues of material fact in this case, and BWXT is entitled to judgment as a matter of law.

-12-

## **Conclusion**

For the reasons stated above, the court finds that defendant BWXT is entitled to judgment as a matter of law on Linson's claims of discrimination under Title VII and 42 U.S.C. § 1981. Accordingly, defendant's motion for summary judgment [Doc. 10] will be granted, and this action will be dismissed against BWXT Y-12, L.L.C.

**ENTER:**

        s/ Thomas W. Phillips
        United States District Judge