**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **JOHNNY LINSON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:06-CV-39** |
| | ) | **(Phillips)** |
| **LOCKHEED MARTIN ENERGY SYSTEMS, INC.,** | ) | |
| **and BWXT Y-12, L.L.C.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Johnny Linson has sued his former employers, Lockheed Martin Energy Systems, Inc. (LMES) and BWXT Y-12, L.L.C., alleging systemic racial discrimination in employment through discriminatory selection, promotion, compensation, and disciplinary policies, practices and procedures, discriminatory terms and conditions of employment, and the existence and perpetuation of a racially hostile work environment in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendant LMES has moved for summary judgment asserting that there are no genuine issues as to material facts, and that LMES is entitled to judgment as a matter of law on all of plaintiff's claims. For the reasons which follow, defendant's motion for summary judgment will be granted, and this action will be dismissed against LMES.

## Factual Background

Beginning April 1, 1984, pursuant to a contract with the Department of Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000. Linson was employed by LMES and the predecessor government contractors at Y-12 from April 14, 1969 until October 31, 2000. Linson was employed by BWXT from November 1, 2000 until February 28, 2001, at which time he retired by going on long term disability related to chronic depression, heart problems, and chronic beryllium disease. Linson served in the Utilities Department throughout his tenure at Y-12.

During Linson's employment at Y-12, he was a member of the Operating Engineers Union, Local 900. The terms and conditions of his employment were governed by contracts between the respective government contractors and the Atomic Trades and Labor Council (ATLC). The contracts between the government contractors and the ATLC governed the utility operators' rate of pay and included a provision prohibiting racial discrimination.

On December 10, 1996, Linson filed a charge with the EEOC, alleging that LMES racially discriminated against him by eliminating his position at Delta 57 in October 1996, failing to provide him training to perform his position at Delta 16, requiring him to work in beryllium areas in violation of his work restrictions and retaliating against him for

engaging in protected activity. On December 21, 1998, the EEOC dismissed Linson's charge because he filed suit in federal court.

On November 6, 1998, Linson filed a lawsuit against LMES and the ATLC in Federal Court. Linson's suit alleged that LMES and the ATLC discriminated against him because of his race regarding the following matters: an incident with George Rimel, unequal overtime assignments, failure to promote, denial of worker's compensation benefits for a 1985 work-related injury, assignments in beryllium areas despite restrictions prohibiting such work, a hostile work environment, having to use vacation time rather than sick leave for doctor's appointments, and the issues raised in the December 10, 1996 EEOC charge. On July 22, 1999, Judge James H. Jarvis, entered an order dismissing Linson's case without prejudice for failure to prosecute. Linson did not revive the dismissal of his lawsuit.

On December 28, 1998, Linson filed a second charge with the EEOC. It asserted that LMES discriminated against him because of his race, age, color and disability status. The circumstances giving rise to the charge included: an incident with Rimel, assignments in beryllium areas despite restrictions prohibiting such work, unequal overtime assignments, failure to promote, denial of worker's compensation benefits for a 1985 work-related injury, a hostile environment, having to use vacation time rather than sick leave for doctor's appointments, and the issues raised in his initial EEOC charge.

-3-

On January 31, 2001, the EEOC filed a notice of "administrative closure," dismissing Linson's second charge. The EEOC administratively dismissed the second charge, concluding it essentially duplicated the first charge. Linson filed the instant action on December 28, 2001, alleging that he was subjected to a hostile work environment during his employment with LMES. Some of the circumstances giving rise to his claim include an incident with Rimel on October 29, 1997, comments by either Tom Minga or Kevin Ross that Linson was asked "to pee in a bottle because he was black" on October 29, 1997, and racial slurs Linson heard in the mid-to-late 1980s. He also relied upon the fact co-employees made defamatory comments about an incident in 1977 when Linson killed a man in self-defense. He further claimed that co-employees shut down his equipment interfering with his job. Finally, he suggested that management's lack of support and negligence relating to work assignments in beryllium areas contributed to a hostile work environment.

LMES has moved for summary judgment asserting that (1) Linson cannot establish a *prima facie* case for his racial discrimination or hostile work environment claims; (2) Linson's failure to promote claim is barred by the applicable limitation periods; (3) his claim for unequal compensation and benefits should be dismissed because his rate of pay was governed by a union contract; (4) Linson's claims are precluded by the doctrine of *res judicata* to the extent they were included or could have been included in an earlier discrimination lawsuit that was dismissed on July 22, 1999; (5) Linson's claims are also barred by the applicable statute of limitations to the extent the claims were not raised in a timely charge with either the Equal Employment Opportunity Commission (EEOC) or the

-4-

Tennessee Human Rights Commission (THRC); and (6) Linson's Title VII claims are barred because he did not file suit within ninety days after the EEOC dismissed his second charge on January 31, 2001. Therefore, LMES asserts that it is entitled to judgment as a matter of law on all plaintiff's claims.

Plaintiff Johnny Linson has responded in opposition, stating that the evidence in this case demonstrates that he was subjected to a hostile work environment, discriminatory terms and conditions of employment, thus precluding summary judgment in favor of LMES.

## **Standard of Review**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish

-5-

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## Analysis

### *Res Judicata*

First, LMES asserts that *res judicata* bars Linson's claims against LMES. The doctrine of *res judicata*, also called claim preclusion, allows a final judgment on the merits of an action to preclude the parties or their privies from relitigating claims that were or could have been raised in that action. *See Franco-Ward v. Nations Credit Corp.,* 2000 WL 875894 (6th Cir. June 20, 2000) citing *Federated Dept Stores, Inc. v Mottie,* 452 U.S. 394, 398 (1981). Under claim preclusion, a final judgment on the merits bars any and all claims by the parties or their privies based on the same cause of action. *See White v. Colman Elec. Co.,* 781 F.2d 1214, 1216 (6th Cir. 1986); *Anchor Motor Freight v. Int'l Brotherhood of Teamsters, Local Union No. 377,* 700 F.2d 1067, 1070 (6th Cir. 1983). *Res judicata* is established with four elements: (1) a final decision rendered on the merits in the first action by a court of competent jurisdiction; (2) the second action involves the same parties or their privies as the first; (3) the second action raises issues actually litigated or which should have been litigated in the first action; and (4) there is an identity of the cause of action. *See Sanders Confectionary Prods. Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir. 1992).

On July 22, 1999, Judge Jarvis dismissed Linson's prior action for failure to prosecute *without prejudice*. The Sixth Circuit has specifically held that a dismissal without prejudice is not a final adjudication on the merits, and *res judicata* does not bar a second

-6-

action.  *Guzowski v. Hartman,* 849 F.2d 252, 255 (6th Cir. 1988).  Therefore, summary judgment on the grounds of *res judicata* is not appropriate.


Statute of Limitations

Second, LMES asserts that Linson's claims arising out of any matter before December 28, 1997 are time barred.  The instant action was filed December 28, 2001.  In *Jones v. R.R. Donnelly & Sons Co.,* 541 U.S. 369 ((2004) the Supreme Court held that a four year statute of limitations applied to claims of race discrimination under 42 U.S.C. § 1981.  Therefore, LMES contends Linson's § 1981 claim relating to matters prior to December 28, 1997 is time barred because such claim accrued more than four years before the filing of the instant suit.


As to Linson's Title VII claim, LMES asserts that such claim is barred because Linson failed to file suit within ninety days after the EEOC's administrative dismissal of his second charge on January 31, 2001.  Any remaining Title VII claims are also barred to the extent Linson failed to file a timely charge with the EEOC.


Linson argues that his second charge was not dismissed by the EEOC, but instead was "administratively closed," and he was never issued a notice of right-to-sue.  He takes the position that  the statute of limitations has not yet begun to run on the claims in his second EEOC charge.

It is well-established that "the filing of a suit which is dismissed without prejudice does not toll the statutory filing period of Title VII." *Wilson v. Grumman Ohio Corp.,* 815 F.2d 26, 28 (6th Cir. 1987); *Hall v. Kroger Baking Co.,* 520 F.2d 1204 (6th Cir. 1975). The same is presumably true for § 1981 claims. The Sixth Circuit has stated that an action dismissed without prejudice leaves the situation the same as if the suit had never been brought. *Bomer v. Ribicoff,* 304 F.2d 427, 428 (6th cir. 1962). In the absence of a statute to the contrary a party cannot deduct from the period of statute of limitations the time during which the action so dismissed was pending. *Id.* The foregoing authority demonstrates that the § 1981 claims Linson asserted or could have asserted in his 1998 lawsuit are barred by the controlling limitations period.

Linson's Title VII claim against LMES is also barred because he failed to file suit within ninety days after the EEOC's administrative closure of his second charge on January 31, 2001. The EEOC/THRC January 31, 2001 administrative closure states that its investigation of Linson's second charge was closed. Linson took no action to pursue his Title VII claims until the instant lawsuit was filed on December 28, 2001. Linson argues that the ninety day right-to-sue period has not yet begun to run, but he has presented no authority for such a novel position. Thus, his failure to file suit within ninety days of receiving the notice of administrative closure is fatal to the Title VII claims addressed in his second charge. *See Mungen v. Choctaw, Inc.,* 402 F.Supp. 1349 (W.D.Tenn. 1975) ("in Title VII cases, the statute of limitations for the commencing of a civil action in a federal court begins to run once the complainant receives notice that conciliation efforts are either terminated or have failed").

-8-

Linson attempts to save his untimely claims by relying upon charges filed by other plaintiffs against LMES under the single-filing rule, also known as "piggy backing." Where a "substantially related" claim arises out of the same time frame as the timely filed claim, the complainant need not satisfy Title VII's filing requirement to recover. *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 839-40 (6th Cir. 1994). A charge will be adequate to support piggy backing under the single filing rule if it contains sufficient information to notify prospective defendants of their potential liability and permit the EEOC to attempt informal conciliation of the claims before a lawsuit is filed. *Howlett v. Holiday Inns, Inc.,* 49 F.3d 189, 196 (6th Cir. 1995). The rule in the Sixth Circuit is that "the complaint and the judicial proceedings are limited not to the words of the EEOC charge but to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *EEOC v. McCall Printing Co.,* 633 F.2d 1232, 1235 (6th Cir. 1980).

Linson's attempt to piggy back with other plaintiffs who filed EEOC charges is unpersuasive for two reasons. First, Linson offers no authority that supports allowing him to piggy back under the facts of his case. Second, his claim is wholly separate and distinguishable from the claims brought by the plaintiffs upon whom he would piggy back. Plaintiffs Moore, Clark, and Sheard[1], upon whom Linson seeks to piggy back, all asserted racial discrimination and hostile environment claims, but their claims arose from alleged conduct and practices within the protective services department at Y-12. The record shows

---

[1] The claims of Moore, Clark, Sheard, Mynatt, Miller, Duff and Linson were originally brought in an action styled Paul Sheard v. Lockheed Martin Energy Systems, et al., Docket No. 3:01-cv-660. By order entered February 2, 2006, the court approved the parties' agreement to sever the individual plaintiff's claims for trial.

that the protective services department is, and always has been, managed separately from the operational divisions like the one where Linson worked. Linson did not share supervision or duties with Moore, Clark or Sheard, nor was he exposed to related conduct.

Similarly, while plaintiffs Mynatt, Miller and Duff were not security guards, they too were not employed in the same area as Linson. None of Linson's supervisors supervised them, consequently, nothing in their charges would have reasonably alerted the EEOC that it needed to investigate any alleged problems in Linson's employment or attempt to conciliate any claims related to or arising from it. Linson points to no evidence that LMES, by virtue of the charges he would invoke, was placed on notice that discriminatory conduct had occurred anywhere near Linson in the Y-12 plant. Nor does Linson show that the EEOC ever, based upon the charges he lists, discovered similar conduct or attempted conciliation of it. Linson's attempt to save his untimely claims by piggy backing fails as a matter of law. Further, any Title VII claim asserted by Linson accuring after July 23, 1999, is barred because Linson failed to file a timely charge with the EEOC. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105 (2002). Accordingly, summary judgment will be granted to LMES on Linson's Title VII claims.

<u>Hostile Work Environment</u>

After granting summary judgment as to Linson's Title VII claims and his § 1981 claims which accrued prior to July 23, 1999, there remain two claims of discrimination under § 1981 which Linson alleges accrued after July 23, 1999: First, Linson contends he was subjected to a hostile work environment during his tenure at LMES. Second, Linson

-10-

claims what while employed by LMES, he was subjected to unequal terms and conditions of employment and disparate treatment.

In the Sixth Circuit, claims under 42 U.S.C. § 1981 require the same standard of proof to establish a *prima facie* case as a Title VII claim. *Newman v. Federal Express Corp.,* 226 F.3d 401, 406 (6th Cir. 2001). Title VII prohibits racial harassment that creates a hostile or abusive workplace. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993); *Newman v. Federal Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). Under Title VII, a plaintiff establishes a *prima facie* case of hostile work environment based on race by demonstrating the following five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer was liable for the harassment. *Hafford,* 183 F.3d at 512.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21. In determining whether there was a hostile work environment, courts look to the "totality of the circumstances." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v.*

-11-

*Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* quoting *Harris,* 510 U.S. at 23. The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Newman,* 266 F.3d at 405, quoting *Faragher,* 524 U.S. at 788.

Linson lists several incidents of alleged racial harassment and discrimination dating from 1996 through 2001. However, the incidents were spread out over a period of five years and cumulatively do not support his allegation of a racially hostile work environment. In addition, while Linson contends that all the incidents he cites were examples of racial discrimination, in the majority of instances, the only suggestion that race was a factor comes from Linson's subjective belief. For example, Linson claims that other employees sabotaged or tampered with his machines, but he offers no proof that such sabotage ever actually occurred, nor has he offered proof that any alleged sabotage was motivated by race. In addition, Linson points to an incident in 1996 where his name was called out over the PA system in the plant. Again, Linson provides no evidence that this action was motivated by his race. Linson also complains that he was not allowed to attend Chronic Beryllium Disease Support Group meetings because of his race. However, Linson's supervisors testified that they were unaware that Linson wanted to attend the

-12-

support group meetings, and once informed that he wanted to attend, efforts were made to allow Linson to attend future meetings.

Linson's case consists mainly of a conglomeration of incidents which are racially neutral. Linson has provided no evidence concerning which white Utility Operators allegedly received more favorable treatment, or the decisionmaker's identity on each occasion. Linson does offer specific allegations relating to the incident with Rimel and the elimination of his positions in 1996 and 1997, However, the incident with Rimel is insufficient to create a hostile work environment.[2]  Moreover, the position eliminations about which Linson complains are not actionable because LMES has offered non-discriminatory reasons for the eliminations, *i.e.* downsizing caused by budgetary cutbacks. Linson has offered no evidence that LMES' legitimate, non-discriminatory reasons are a pretext for discrimination.  As to Ross' statement that Linson had to "pee in a bottle because he is black" (referring to a drug screen), LMES took prompt remedial action by counseling Ross about the inappropriate comment, and conducted a training program in response to the incident.  Viewing these incidents collectively, the court finds they do not rise to the "threatening" or "humiliating" level of severe conduct required to create an

---

[2] The Rimel incident occurred on October 29, 1997, during a daily briefing for utility operators. Linson alleges the following exchange occurred: "Chief Union Steward, George Rimel came over to me and said - the reason that you don't want to sit down is because you are afraid of these men.  I told him - I'm not afraid of nobody in here.  Then George Rimel said - We all have guns and we will use them.  To which I responded - I have a gun too, and I will shoot.  Then George said - We will get you first.  And I responded - That may be true, but I will make sure that before they get me, I will get you." Rimel reported to Supervisor Perkins that Linson had a gun on the premises.  Perkins summoned Linson to her office along with security officers, who conducted a frisk of Linson for weapons and searched Linson's car with his permission.  No gun was found. The investigation confirmed that a verbal exchange involving guns occurred between Linson and Rimel.  However, Supervisor Perkins concluded that no credible threats were made during the verbal exchange and that neither Linson nor Rimel were in danger.  No disciplinary action was taken against either individual.

-13-

objectively hostile or abuse work environment under Title VII.  Moreover, Linson has not demonstrated that any of his supervisors made a racial slur or racially insensitive remark. Accordingly, LMES is entitled to summary judgment on Linson's hostile work environment claim.

Disparate Treatment

Linson alleges four alleged incidents of disparate treatment by LMES during the time frame of July 23, 1999 to October 31, 2000, including (1) assignments in beryllium areas despite restrictions prohibiting such work; (2) unequal overtime assignments; (3) Davidson's supervision; and (4) unequal training."  To establish a claim of disparate treatment, Linson must show that he was treated differently from similarly-situated employees on account of his race.  *Mitchell v. Toledo Hospital,* 964 F.2d 577-582-83 (6th Cir. 1992).

Linson first alleges that LMES discriminatorily assigned him to work in beryllium areas in violation of his medical restrictions.  However, Linson has not demonstrated that he was treated differently than similarly-situated, non-minority employees.  Linson, during his deposition, offered no evidence concerning how he was treated differently than Gary Foster, the white utility operator to whom he attempted to compare himself:

> Q.     Well, I'm trying to find out what it was about your disease that you're saying he should have done that he didn't do.

-14-

A.     For example, Gary Foster was diagnosed with chronic beryllium disease in my department. He was not treated the way that I was as far as his sickness was concerned. I was treated indifferent altogether.

Q.     How was he treated differently?

A.     He was white.

Q.     How was he treated differently? How was your treatment different from his?

A.     He didn't get harassed, he didn't get gun play set up on him, he wasn't defamed at work, he wasn't written up for disciplinary reasons.

Q.     What else?

A.     I can't think of nothing else right now.

In contrast, LMES supervisor David Harvey testified that Linson's supervisors maintained a list of buildings containing beryllium areas and a list of utility operators restricted from working within the beryllium areas. Work assignments were made in accordance with the lists. To the extent Linson, or any other employee, believed a work assignment was prohibited by medical restrictions, the union contract's stop work provision or the Ethics Office, under the Employee Concerns Program, provided a means through which to determine whether assignments violated the applicable restrictions. Foster testified that he was assigned work in beryllium areas after he was diagnosed with chronic beryllium disease (CBD). Foster, on each occasion, advised the supervisor making the work assignment that he had CBD, and he was given another job. This is precisely what Linson's supervisor, Perkins, instructed him to do if a supervisor mistakenly assigned him

-15-

work in an area that violated his medical restrictions. It is also how Della Redd, an African-American utility operator, handled a situation where her work required her to enter a beryllium area. After reporting this fact to her supervisor, she was not required to enter the beryllium area. Linson has offered no proof that he was made to work in a beryllium area after advising his supervisor that he had CBD, nor has he shown that any such work assignment was made on the basis of his race. Accordingly, Linson has presented no material issue of fact that he was treated differently than Foster.

As to Linson's claim that he was treated differently with regard to overtime assignments, he does not identify with specificity any similarly-situated, white employees who received more favorable overtime assignments than him; when the alleged discriminatory conduct occurred; or who was the decisionmaker for each occasion. The plaintiff must offer "concrete evidence from which a reasonable jury could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). Linson's allegations are so vague, they could not support a verdict. As such, they fail to raise more than a scintilla of evidence in support of his overtime claim.

Linson also complained about being required to report to Willie Davidson, an African-American utility supervisor. Davidson became Linson's supervisor in either 1994 or 1995. Linson alleges his assignment under Davidson was discriminatory because Linson killed Davidson's cousin in 1977. The record shows that when Linson complained to Perkins about the assignment, Perkins transferred Davidson to another shift. After the reassignment, Davidson periodically served as Linson's supervisor when Linson's regular

-16-

supervisor was absent due to illness or vacation. Linson testified that Davidson served in this capacity "maybe once a month" after the reassignment through the year 2000. Linson further testified that Davidson "tried to treat me normal," and did not make any offensive remarks. Linson fails to show how this assignment constitutes an adverse employment action, and he fails to show that he was treated differently than similarly-situated, non-minority employees.

Linson's failure to train claim also fails because he cannot establish either an adverse action or that he was treated differently than similarly-situated, non-minority employees. *See Douglas v. Caldera,* 2002 WL 187366 (6th. 2002) (affirming summary judgment in gender discrimination action because denial of training did not constitute an adverse employment action).

Linson's claim for disparate treatment, like his claim for hostile work environment, consists mainly of a conglomeration of incidents which are racially neutral. There are no allegations, other than Linson's global allegation, that any of the conduct involved race. Linson offers no proof that his assignments to beryllium areas, lack of overtime, or unequal training had a racial subtext. A racial nexus is also missing from Linson's allegations regarding his assignment under Willie Davidson. In sum, the evidence fails to establish that Linson suffered disparate terms and conditions of employment at LMES because of his race. Accordingly, summary judgment will be granted to LMES.

-17-

## **Conclusion**

For the reasons stated above, the court finds that defendant Lockheed Martin Energy Systems is entitled to   judgment as a matter of law on Linson's claims of discrimination under Title VII and 42 U.S.C. § 1981.  Accordingly, defendant's motion for summary judgment [Doc. 12] will be granted,  and this action will be dismissed against Lockheed Martin Energy Systems.


**ENTER:**


_____s/ Thomas W. Phillips_____
United States District Judge